## IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF PENNSYLVANIA

TAWNYA ROMAN,

   Plaintiff,

v.

ERIC RYAN CORPORATION and KEITH
VENEZIE in his individual capacity,

   Defendants.

Case No.

**COMPLAINT IN CIVIL ACTION**

**JURY TRIAL DEMADED**

## COMPLAINT

AND NOW, comes the Plaintiff, Tawnya Roman, by and through her attorneys Kraemer, Manes & Associates, LLC and Martell Harris, Esquire, and files this Complaint against Defendant, alleging the following:

## INTRODUCTION

Plaintiff**,** is a former employee of the Eric Ryan Corporation, who moved up through the ranks of the company and eventually became its President.  Plaintiff suffered from intolerable sexual harassment from the owner and CEO of Defendant Eric Ryan Corporation, and was retaliated against for attempting to enforce her applicable rights under Title VII by way of her termination.  As the owner and CEO of the company, Keith Venezie's actions are attributable to the corporation for purposes of Title VII and her termination was retaliation.  Furthermore, Defendant breached its original contract with Plaintiff related to her claims stemming from Title VII.

This action seeks equitable relief, as well as monetary damages, to redress Defendants' unlawful conduct in violation of 42 U.S.C. § 2000e *et seq.*, and 43 P.S. § 955, 43 P.S. § 260.1 *et seq.*, as well as the Common Law of Pennsylvania.

## JURISDICTION AND VENUE

1.      This Action arises under 42 U.S.C. § 2000e *et seq.* Title VII of the Civil Rights Act of 1964 ("Title VII") and 29 U.S.C. § 2601 *et seq.*, The Family Medical Leave Act ("FMLA").  This Court has jurisdiction over Plaintiff's federal claims, pursuant to 28 U.S.C. § 1331.  This Court has jurisdiction over Plaintiff's related state law claims pursuant to 28 U.S.C. § 1367(a).  A substantial part of the events or omissions giving rise to the claims, occurred in the Western District of Pennsylvania, and venue is proper pursuant to 28 U.S.C. § 1391(b).

2.      Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission at Charge Number 533-2016-00378.  This Charge was cross-filed with the PHRC.  More than 180 days have passed since the filing of this Charge, and a Right to Sue letter was requested on October 26, 2016, thereby exhausting Plaintiff's administrative remedies.

## PARTIES

3.      Plaintiff, Tawnya Roman, ("Mrs. Roman") is a female former employee of the Defendant, who currently lives in Beaver County Pennsylvania.

4.      Defendant, Eric Ryan Corporation ("Defendant" or "ERC") is a business corporation headquartered at 1 Early Street Suite A, Ellwood City, Pennsylvania 16117.  ERC is an auditing company who at all relevant times hereto, Defendant ERC served as Mrs. Roman's employer.

5.      Defendant, Keith Venezie ("Mr. Venezie") is the Owner and CEO of Defendant ERC who at all times relevant hereto, worked as Mrs. Roman's supervisor.

**FACTS**

6.      In or around January 2004, Mrs. Roman began working for Defendant as a part-time Scanner.  Mrs. Roman was responsible for entering paper utility bills into Defendant's computer systems.  Mrs. Roman worked night shifts, through which she came into contact with Mr. Venezie.  Mr. Venezie often came into the office in the middle of night after being out drinking.  During this time period, Mr. Venezie made a number of loud comments about his level of intoxication.

7.      In or around March 2004, Mrs. Roman was promoted to Account Manager.  As an Account Manager, Mrs. Roman was responsible to audit and approve client telephone bills.  At this time, Mrs. Roman's schedule was daylight shift Monday through Friday.  At this time, Mrs. Roman's direct supervisor was Rebecca Hink ("Ms. Hink") who is currently the Chief Operating Officer for Defendant.

8.      In or around May 2004, Mr. Venezie called Ms. Roman into a meeting in Ms. Hink's office, and informed Mrs. Roman that her position was being switched to Utility Account Manager.  Mrs. Roman had no experience with this position at the time, where her responsibilities expanded to include utility bill approval for Inkeeper's Hospitality, which at the time was one of Defendant's largest accounts.  This account was known as a high profile client who seemed to complain to the Company on a regular basis.  This change made Mr. Venezie Mrs. Roman's direct supervisor.  Mrs. Roman expressed hesitation at the move, and Mr. Venezie promised to spend "all day everyday" with her in order to train her for the position.

9.     After approximately two days of being available to Mrs. Roman to answer questions as needed, Mr. Venezie disappeared and Mrs. Roman was unable to reach him for a number of questions she had about her new position.  Mr. Venezie remained unavailable for the next few days, during which time, Mrs. Roman turned to Mary DeCaria ("Ms. DeCaria") the Chief Financial Officer for Defendant.   When Mr. Venezie returned to the office, he began sexually harassing Mrs. Roman.  This included constant requests and/or demands for Mrs. Roman to have sex with Mr. Venezie.  Each time, Mrs. Roman refused such a request or demand.   Mr. Venezie informed Mrs. Roman that it was his mission to "sleep with every woman in the company."  Mrs. Roman constantly told Mr. Venezie that his comments and harassment was unwelcome, and at some point, asked Mr. Venezie why he was even married, and he replied "It's cheaper to keep her."

10.     In or around July 2004, Mr. Venezie offered Mrs. Roman five hundred dollars ($500.00) for her to go from the bar they were at, to the Alpine Inn in Beaver Falls and engage in sex with him and another co-worker, Melissa Pint ("Ms. Pint").  At some point in the evening, Ms. Pint's sister Jamie Ritter ("Ms. Ritter") came to the bar, and Mr. Venezie offered Mrs. Roman one thousand dollars ($1000.00) to engage in sex with Ms. Pint and Ms. Ritter.  Mrs. Roman agreed to drive Ms. Pint to the Alpine Inn, but refused to go inside, and left the hotel.  Within an hour, Ms. Pint called Mrs. Roman and requested that Mrs. Roman come "get her out of the situation."  When Mrs. Roman arrived to pick up Ms. Pint, she could hear Mr. Venezie and Ms. Ritter having sex from the parking lot.

11.     Over the next approximately two years, Mr. Venezie made a number of comments to Mrs. Roman including but not limited to the following:

    a.   Mr. Venezie regularly informed Mrs. Roman that she looked "hot"; and

    b.   Mr. Venezie regularly told Mrs. Roman that she was "turning him on."

12.    Mrs. Roman was uncomfortable due to Mr. Venezie's advances, but was too afraid to speak up because of his power over her position, and her need to care for her young child.  Mr. Venezie was aware that Mrs. Roman needed her job, and purposefully intimidated her from reporting his behavior.  In or around early 2006, Mr. Venezie's behavior increased as described in part below:

    a.   On or about February 9, 2006, Mr. Venezie informed Mrs. Roman that she should "grab" him as he was walking around the office (emphasis in original);

    b.   Mr. Venezie referred to Mrs. Roman as "Spanks";

    c.   Mr. Venezie told Mrs. Roman that if he "knew that [Mrs. Roman] was going to be up so late, [he] would have stopped by her home on [his] way from the airport"; and,

    d.   Mr. Venezie told Mrs. Roman that he wanted to "run away" with her and get "freekie" (sic);

13.    On or about December 9, 2006 Defendant had a team building exercise. Defendant provided a party bus to drive employees to shop together at the mall,  Mr. Venezie provided wine while the bus was travelling to the mall.  While at the mall, the employees went to the bar, and Defendant paid the tab for the alcohol.  On the return trip, there was still alcohol available on the bus.  When the bus returned, Mrs. Roman went home, while Mr. Venezie and other employees went to a local bar.  A short time later,

Mrs. Roman was called and asked to return to the bar.  When Mrs. Roman arrived, everyone from work was intoxicated.  Mrs. Roman was and remained sober during her time at the bar.  At the bar, Mr. Venezie's son Eric was drunkenly yelling the following:

      a.  That Mr. Venezie "fucks" all of the women at work;

      b.  That he was tired of Mr. Venezie cheating on his mother; and,

      c.  He asked a number of employees, including Mrs. Roman such as Ms. Hink if they "fucked" Mr. Venezie.

14.    Recognizing the danger of Eric Venezie driving, Mrs. Roman took his keys, and drove him home.  Later that night, Mr. Venezie accused Mrs. Roman of driving while intoxicated and providing his son with cocaine, and threatened to do the same with Mrs. Roman's son.  Following this accusation, Mrs. Roman, who vociferously denies such actions, reported these incidents to Ms. DeCaria and Deborah Hawthorne, Mrs. Roman's immediate supervisor.  Mr. Venezie refused to discuss the incidents with or answer to anyone.  Mrs. Roman confronted Mr. Venezie over the harassment and accusations, but he refused to engage in any discussion, however, for the next approximate year, Mr. Venezie generally stopped harassing Mrs. Roman.

15.    On or about December 4, 2008, Mrs. Roman was on a business trip to Florida with Mr. Venezie and Christine Bentel ("Ms. Bentel").  While in Florida, Mr. Venezie suggested a day of relaxation prior to the meeting, and commissioned a limousine to drive around Orlando to various bars and strip clubs.  At some point during the ride, Ms. Bentel, after encouraging Mrs. Roman to have sex with Mr. Venezie, went to the front seat of the limousine, leaving Mrs. Roman alone in the back with Mr. Venezie.  Based on these facts, it is believed and therefore averred that Mr. Venezie

instructed Mrs. Bentel to ride in the front so that he could be alone with Mrs. Roman. During this time, Mrs. Roman "blacked out" and has since been unable to remember the events of the rest of the evening.  Mrs. Roma's last memory is seeing Mr. Venezie's pants unzipped and seeing his exposed underwear, and subsequently vomiting.  Based on these facts, it is believed and therefore averred that Mr. Venezie drugged Mrs. Roman.

16.    When Mrs. Roman awoke, she discovered that Ms. Bentel went to the Emergency Room at Health Central Orlando because she believed that she was having a heart attack.  Health Central Orlando was in fact the client with whom Mrs. Roman Mr. Venezie and Ms. Bentel were in town to meet.  Defendant's contact at Health South Orlando was James White ("Mr. White") who has engaged in a sexual relationship with both Ms. Bentel and Mr. Venezie.

17.    Approximately three days after returning from Orlando, while in a staff meeting, Mr. Venezie was questioned about the expenses incurred during the business trip, which were considered "excessive."  Mr. Venezie reacted angrily and yelled at Mrs. Roman that it was her "responsibility to ensure he behaves" while travelling on business. During the meeting, Defendant's approval process for expenses was transferred, at his own suggestion, from Mr. Venezie to Nina Burke, ("Ms. Burke"), Defendant's Financial Director, so that Mr. Venezie could be "kept in line."

18.    Almost immediately after this meeting, Mr. Venezie began more aggressively sexually harassing Mrs. Roman, by engaging activities including but not limited to the following:

        a.   Mr. Venezie continuously referred to Mrs. Roman as his "wife"; and,

  b. Mr. Venezie continuously sent Mrs. Roman sexually suggestive and

    harassing messages through email.  These messages included

    references including but not limited to:

    i. Constant references to limousine rides, which are in specific and

     direct reference to the events as generally described in ¶¶ 15-17 of

     this complaint;

    ii. Constant references to a desire to marry Mrs. Roman; and,

    iii. Mr. Venezie informed Mrs. Roman that he makes it his "mission to

     sleep with every woman" in the company;

19. Mr. Venezie's harassment of Mrs. Roman continued, generally unabated for the next several years.  Mr. Venezie would consistently request that Mrs. Venezie engage in sex with him, and each time she refused, he punished her by taking away her ability to work from home, while allowing male employees to work from home.

20. During this time, Mr. Venezie also attempted to force Mrs. Roman to engage in illegal and fraudulent activities, to which Mrs. Roman refused. Upon discovering the illegal nature of these requests, and her subsequent refusal, Mr. Venezie refused to give Mrs. Roman her bonus for December 2014.

21. On or about February 6, 2014, Mrs. Roman fell ill at work while in a meeting with Ms. DeCaria.  Mrs. Roman fainted, and was taken to the emergency room, whereupon she was diagnosed after three days of hospitalization with stress related blood clots and spiking blood pressure based on stress.  At the time, Mrs. Roman did not have abnormal stress outside of the workplace, which was specifically caused by Mr. Venezie and her work environment.

22.     Mrs. Roman returned to work on or about February 11, 2014.  Between that date, and on or about March 15, 2014, Mrs. Roman was forced to work in excess of fifty-seven (57) hours per week, which exacerbated her stress levels.  During this time, the harassment from Mr. Venezie continued, after a short abatement of approximately one week.

23.     On or about March 18, 2014, with the culmination of harassment and other stress from her work environment, Mrs. Roman was suffering from migraines and sleeplessness and was ultimately, again, hospitalized for stress.  At this time, Mrs. Roman did not have abnormal stress outside of the workplace, which was specifically caused by Mr. Venezie and her work environment.  Mr. Venezie visited Mrs. Roman in the hospital, where he apologized to Mrs. Roman for his actions and promised that they would cease.  Mr. Venezie also made this apology and promise to Mr. Roman.

24.     Following her release from this hospital visit, Mrs. Roman was instructed by Dr. Susan T. Federoff, M.D. ("Dr. Federoff") to take one month off work.  Mrs. Roman provided this instruction to Ms. DeCaria, and was subsequently told that Defendant was placing her on FMLA through April 19, 2014.

25.     While on FMLA until on or about April 21, 2014, Mr. Venezie forced Mrs. Roman to work from home and occasionally come into the office to do work as well.  During the time that Mrs. Roman was to be off for FMLA, she worked one hundred and nineteen (119) hours.  When Mrs. Roman returned to work, Mr. Venezie told her to "take it easy, and not work too many hours", and for approximately one to two months, he did not harass her.

26.     In or around July, 2014, Mr. Venezie resumed his harassing comments and actions, including but not limited to the following:

    a.  Discussion with Mrs. Roman about the physical attributes of various women, and his desire to date them;

    b.  Additional references and comments to limousines;

    c.  Referred to Mrs. Roman as his "utility girlfriend";

    d.  Discussion at Mrs. Roman about his own sexual abilities; and,

    e.  A number of additional comments, which Mr. Venezie admitted were "probably more than [female employees including Mrs. Roman] wanted to know."

27.     On or around March 17, 2015, Mrs. Roman approached Mr. Venezie about the resurgence in his harassing behavior, and the stress of the work environment and amount of work.  Mrs. Roman informed Mr. Venezie that she was again approaching her "breaking point" and asked to be moved to part-time employment to have less exposure to Mr. Venezie's harassment and the stress of her work environment.  Mr. Venezie honored this request, on the condition that Mrs. Roman inform the other staff that she was moving to part-time to focus on taking care of the animals she formerly housed by operating an Animal Rescue.  Mrs. Roman was to work three days per week, and her pay would be cut by twenty percent (%20) and that her Paid Time Off ("PTO") would remain the same.  Despite this agreement, Mr. Venezie instructed Human Resources that Mrs. Roman's PTO be limited to five (5) weeks.  Mr. Venezie announced Mrs. Roman's change by saying "do (sic) to reasons [that he did not] wish to disclose..." that Mrs. Roman's schedule was being changed.

28.     During the time that Mrs. Roman was working part-time, Mr. Venezie continued sexually harassing Mrs. Roman and purposefully acting in ways that he knew would cause Mrs. Roman additional stress, including but not limited to the following:

    a.   On her days off, Mr. Venezie would still call Mrs. Roman;

    b.   On her days off, Mr. Venezie would still email Mrs. Roman, and demand responses to those emails;

    c.   Mr. Venezie would threaten to take away Mrs. Roman's remaining PTO if she was not in the office thirty-two (32) hours per week; and,

    d.   Mr. Venezie told Mrs. Roman that "A cheerful smile and cleavage always does the trick."

29.     On or about July 4, 2015, Mrs. Roman took her vacation which was accrued under the applicable policy.  Mr. Venezie was upset that Mrs. Roman would be out of the office for eleven (11) days, while only using two (2) day's worth of PTO.  On or about July 8, 2015, Mr. Venezie changed the company handbook in regards to PTO use, and tried to make Mrs. Roman sign off that the change applied to her.  Mr. Venezie threatened to take away all her previously accrued PTO and holiday pay if she did not sign and agree to the new policy to apply to her, and return to the office.

30.     Mrs. Roman sought the advice of an attorney in regards to her work situation.

31.     On or about July 9, 2015, Mrs. Roman informed Ms. DeCaria that she saw an attorney, in regards to her work environment.  Ms. DeCaria summoned Ms. Hink and Ms. DeCaria informed Ms. Hink that Mrs. Roman saw an attorney in relation to the work environment.  Ms. DeCaria and Ms. Hink told Mrs. Roman that they knew that "someone

was going to do this eventually" and that Mr. Venezie's behavior was going to eventually "bite him" and that she previously warned Mr. Venezie about his behavior towards the female employees of the company.  Both Ms. DeCaria and Ms. Hink were crying, and then met with Mr. Venezie.  Mrs. Roman was instructed to remain in her office, to which she complied.

32.     A short time later Ms. DeCaria came to Mrs. Roman's office and called her into a meeting with Mr. Venezie, Ms. DeCaria, and Ms. Hink.  In this meeting, Mr. Venezie immediately exclaimed "so you're gonna sue me?"  Mrs. Roman started crying, saying that she was tired of the harassment, the policy changes, the limousine comments etc.  Mr. Venezie asked Mrs. Roman "what she wants" and threatened that her lawsuit was going to "cost everyone's job and ruin everyone's life" who worked for the company.  Mr. Venezie informed Mrs. Roman on numerous occasions during the meeting that she "can't work [for Defendant] and sue me."  Mrs. Roman asked if she was being fired, and Mr. Venezie confirmed her termination, because "you can't work here and sue me."  Mr. Venezie instructed Mrs. Roman to return with a specific settlement demand and to bring it to Ms. DeCaria.

33.     Later, on the afternoon of July 9, 2015, Mrs. Roman called Ms. DeCaria and informed her that her offer was two (2) years' salary to be paid regularly over the next two years, which would amount to $143,208.00 in forty-eight (48) bi-monthly payments, less applicable taxes, and an additional lump sum of $10,191.28, less applicable taxes, calculated from her earned PTO.  Ms. DeCaria said that she would check with Mr. Venezie, and would then return the call to respond to Mrs. Roman's demand.

34.     Approximately fifteen minutes later, Ms. DeCaria called Mrs. Roman and informed Mrs. Roman than Defendant agreed to Mrs. Roman's demands.  Ms. DeCaria asked only that the lump sum payment not be due until September 1, 2015, to which Ms. Roman agreed.  Ms. DeCaria assured Mrs. Roman that Defendant would not violate this agreement.  This was the last conversation Mrs. Roman had with Ms. DeCaria, Mrs. Roman's own godmother.

35.     Mrs. Roman's picture and profile was removed from Defendant's website shortly thereafter.

36.     Mrs. Roman was scheduled to meet with Defendant and Defendant's attorneys to formalize the agreement.  Two days before this scheduled meeting, Mrs. Roman's picture and profile were re-published on Defendant's website.

37.     In the meeting, Defendant's attorney accused Mrs. Roman of "quitting for no reason" and that Defendant was "refusing to accept" Mrs. Roman's "resignation" and that she was still an employee of Defendant.  Mrs. Roman was subsequently instructed to return to work by September 2, 2015 and that she was still an employee and had never been terminated.  Following this meeting, Defendant stopped paying Mrs. Roman according to the terms of their previous agreement.

**COUNT I**
**42. U.S.C. § 2000e *et seq,* Title VII**
**Sex Discrimination- Hostile Work Environment**

38.     All previous paragraphs are incorporated.

39.     Title VII prohibits discrimination against employees based on their sex, and requires that such discrimination yield equitable relief and monetary damages against any employer found to have so discriminated.

40.    Under Title VII defines "hostile work environment" is defined as one in which harassment based on an employee's sex materially alters the terms and conditions of employment, by way of severe, continuing and pervasive conduct by the employer against the employee, on the basis of the employee's sex.

41.    Defendant's actions as described above violated Title VII because Mrs. Roman's terms and conditions of employment, as is true of anyone's employment, did not include constant sexual harassment and intimidation as more thoroughly noticed in the previous paragraphs of this complaint.

42.    Mrs. Roman was subjectively offended by Mr. Venezie's conduct, as would a reasonable similarly situated individual.

43.    Defendant's actions infer tortious intent, because  they were specifically geared towards Mr. Venezie's sexual advancements, Mrs. Roman's refusal to engage in sexual activity with Mr. Venezie and his reactions to those refusals.  Mr. Venezie's words and actions regarding various pet names for Mrs. Roman, and direct requests for sex throughout Mrs. Roman's employment constitute direct evidence of discriminatory intent.  Additionally, the paragraphs above indicate myriad circumstantial evidence for Mr. Venezie's discriminatory intent.

44.    Defendant is vicariously liable for any tortious conduct of its Owner and CEO pursuant to the provisions of Title VII.

45.    Mrs. Roman has suffered damages, which were directly and proximately caused by Defendant.

**COUNT II**
**43 P.S. § 955 PHRA**
**Sex Discrimination- Hostile Work Environment**

46.     All previous paragraphs are incorporated.

47.     The PHRA prohibits discrimination against employee based on their sex, and requires that such discrimination yield equitable relief and monetary damages against any employer found to have so discriminated.

48.     Under the PHRA defines "hostile work environment" is defined as one in which harassment based on an employee's sex materially alters the terms and conditions of employment, by way of severe, continuing and pervasive conduct by the employer against the employee, on the basis of the employee's sex.

49.     Defendant's actions as described above violated the PHRA because Mrs. Roman's terms and conditions of employment, as is true of anyone's employment, did not include constant sexual harassment and intimidation as more thoroughly noticed in the previous paragraphs of this complaint.

50.     Defendant's actions infer tortious intent, because they were specifically geared towards Mr. Venezie's sexual advancements, Mrs. Roman's refusal to engage in sexual activity with Mr. Venezie and his reactions to those refusals.  Mr. Venezie's words and actions regarding various pet names for Mrs. Roman, and direct requests for sex throughout Mrs. Roman's employment constitute direct evidence of discriminatory intent.  Additionally, the paragraphs above indicate myriad circumstantial evidence for Mr. Venezie's discriminatory intent.

51.     Mrs. Roman was subjectively offended by Mr. Venezie's conduct, as would a reasonable similarly situated individual.

52.     Defendant is vicariously liable for any tortious conduct of its Owner and CEO pursuant to the provisions of the PHRA.

53.     Mrs. Roman has suffered damages, which were directly and proximately

caused by Defendant.

**COUNT III**
**42. U.S.C. § 2000e *et seq,* Title VII**
**Sex Discrimination- Retaliation**

54.     All previous paragraphs are incorporated.

55.     Title VII prohibits retaliation from an employee having engaged in a

Protected Activity, whereupon said employee opposes a discriminatory employment

practice, and requires that such retaliation yield equitable relief and monetary damages

against any employer found to have so discriminated.

56.     Mrs. Roman engaged in Protected Activity each time she refused to have

sex with Mr. Venezie, each time she asked Mr. Venezie to stop harassing her, and when

she informed Defendant that Mr. Venezie's actions were illegal as more fully described

in the previous paragraphs.

57.     Immediately following her Protected Activities, Mr. Venezie treated Mrs.

Roman disparately in regards to working from home, and increased the level of his

harassment as more fully detailed in the previous paragraphs of this complaint.

Immediately upon learning that Mrs. Roman sought legal advice with respect to her work

environment, Mr. Venezie terminated Mrs. Roman, telling her that she "can't work here

and have a lawsuit against me."

58.     Defendant's actions as described above violate the retaliation provisions

of Title VII, because of the temporal proximity between Mrs. Roman's Protected

Activities and subsequent discriminatory treatment being immediate, and that Mr.

Venezie specifically informed Mrs. Roman that she was being terminated for "having a lawsuit."

59.     Defendant is vicariously liable for any tortious conduct of its Owner and CEO pursuant to the provisions of Title VII.

60.     Mrs. Roman has suffered damages, which were directly and proximately caused by Defendant.

**COUNT IV**
**43 P.S. § 955 PHRA**
**Sex Discrimination- Retaliation**

61.     All previous paragraphs are incorporated.

62.     The PHRA prohibits retaliation from an employee having engaged in a Protected Activity, whereupon said employee opposes a discriminatory employment practice, and requires that such retaliation yield equitable relief and monetary damages against any employer found to have so discriminated.

63.     Mrs. Roman engaged in Protected Activity each time she refused to have sex with Mr. Venezie, each time she asked Mr. Venezie to stop harassing her, and when she informed Defendant that Mr. Venezie's actions were illegal as more fully described in the previous paragraphs.

64.     Immediately following her Protected Activities, Mr. Venezie treated Mrs. Roman disparately in regards to working from home, and increased the level of his harassment as more fully detailed in the previous paragraphs of this complaint. Immediately upon learning that Mrs. Roman sought legal advice with respect to her work environment, Mr. Venezie terminated Mrs. Roman, telling her that she "can't work here and have a lawsuit against me."

65.     Defendant's actions as described above violate the retaliation provisions of the PHRA, because of the temporal proximity between Mrs. Roman's Protected Activities and subsequent discriminatory treatment being immediate, and that Mr. Venezie specifically informed Mrs. Roman that she was being terminated for "having a lawsuit."

66.     Defendant is vicariously liable for any tortious conduct of its Owner and CEO pursuant to the provisions of the PHRA.

67.     Mrs. Roman has suffered damages, which were directly and proximately caused by Defendant.

**COUNT V**
**Common Law of Pennsylvania**
**Breach of Contract**

68.     All previous paragraphs are incorporated.

69.     On July 9, 2015, Mrs. Roman orally offered a contract to Defendant ERC.

70.     On July 9, 2015, Defendant ERC orally counter offered a contract to Mrs. Roman.

71.     On July 9, 2015, Mrs. Roman orally accepted Defendant's counter offer, forming a contract that Defendant ERC would pay Mrs. Roman $143,208.00, less applicable taxes, over a two year period beginning with the first pay day after July 9, 2015, and on September 1, 2015, Defendant would pay Mrs. Roman an additional $10,191.28, less applicable taxes.  In exchange, Mrs. Roman would not seet damages under Title VII.

72.    After making four (4) payments, and before making the due payment of $10,191.28, less applicable taxes, Defendant ERC breached the agreement by discontinuing payments to Mrs. Roman.

73.    Mrs. Roman suffered injury and damages of $141,465.28, directly and proximately caused by Defendant's breach.

**COUNT VI**
**Common Law of Pennsylvania**
**Intentional Infliction of Emotional Distress against Defendant Keith Venezie**

74.    All previous paragraphs are incorporated.

75.    Mr. Venezie had specific knowledge that his harassing behavior was physically detrimental to Mrs. Roman, as more fully detailed in the previous paragraphs.

76.    Irrespective of this specific knowledge, Mr. Venezie's actions would constitute actionable torts pursuant to 43 P.S. § 955.

77.    Despite this knowledge, Mr. Venezie specifically and purposefully continued to harass Ms. Roman and to discriminate and retaliate against Mrs. Roman, to the extent that Mrs. Roman was hospitalized on more than one occasion as more fully detailed in the previous paragraphs.

78.    Mr. Venezie's actions were extreme and outrageous as more fully detailed in the previous paragraphs.

79.    Mrs. Roman suffered severe emotional distress, directly and proximately caused by Mr. Venezie's conduct.

80.    Mrs. Roman suffered injury and damages, directly and proximately caused by Mr. Venezie's conduct.

**COUNT VII**
**43 P.S. § 260.1 *et seq.* WPCL**

**Failure to Pay Wages**

81.     All previous paragraphs are incorporated.

82.     The WPCL requires that wages earned are due to be paid on a set scheduled pay-day, and requires damages against an employer who so fails to pay such due wages.

83.     The WPCL defines "employer" as "every person, firm, partnership, association, corporation, receiver or ... any agent or officer of the above-mentioned classes employing any person in this Commonwealth."  Therefore Defendant ERC and Mr. Venezie are jointly and severally liable for violations of the WPCL as Mr. Venezie is the CEO of Defendant ERC.

84.     The defendants violated the WPCL when Mrs. Roman was forced to work one hundred and nineteen (119) hours during the time she was taking FMLA leave, which is unpaid leave, and Mrs. Roman was not reimbursed for the pay that would be due for the work done during those hours, as described in ¶¶ 24-25 of this complaint.

85.     The defendants violated the WPCL when MRs. Roman was denied her 2014 bonus for refusing to succumb to or engage in illegal activities as described in ¶20 of this complaint.

86.     Defendants have no good-faith basis to withhold these due wages, in the amount of $4,096.74 and are therefore subject to liquidated damages pursuant to the WPCL.

WHEREFORE, Plaintiff, Tawnya Roman, respectfully requests this this Honorable Court enter Judgment in her favor and against that of Defendant Eric Ryan Corporation, and to award damages to Plaintiff as follows:

1.  Unpaid wages in the amount of $4,096.74;

2.  Liquidated damages on Unpaid wages in the amount of $1,024.18;

3.  Pre-judgment interest on back wages at the prevailing rate, compounded daily from the date such wages were originally due;

4.  Mandatory attorney's fees to be calculated by fee petition following trial;

5.  Back wages of $92,987.11 increased by $196.18 each day after the filing of this complaint;

6.  Pre-judgment interest on back wages at the prevailing rate, compounded daily from July 9, 2015 through the date of judgment;

7.  Front wages to be determined by the fact-finder at trial calculated at $196.18 per day;

8.  Breach damages of $141,465.28, less applicable taxes;

9.  Pre-judgment interest on Breach damages at the prevailing rate, compounded daily from July 27, 2015 through the date of judgment;

10. Maximum punitive damages allowable under Title VII;

11. Additional compensatory damages pursuant to the PHRA as determined by the fact-finder at trial;

12. Additional attorney's fees to be calculated by fee petition following trial;

13. Costs of suit; and,

14. Additional equitable relief as may be deemed necessary by this Honorable Court.

Plaintiff Tawnya Roman further requests that this Honorable Court enter judgment in her favor and against that of Defendant Keith Venezie, and award to Plaintiff as follows:

1. Unpaid wages in the amount of $4,096.74;

2. Liquidated damages on Unpaid wages in the amount of $1,024.18;

3. Pre-judgment interest on back wages at the prevailing rate, compounded daily from the date such wages were originally due;

4. Mandatory attorney's fees to be calculated by fee petition following trial;

5. Compensatory damages as determined by the fact-finder at trial;

6. Punitive damages as determined by the fact-finder at trial; and,

7. Prejudgment interest at the prevailing rate, compounded daily, calculated from the date that the fact-finder at trial determines that the tort was completed, within the applicable statute of limitations;

Respectfully submitted,

**KRAEMER, MANES & ASSOCIATES, LLC**
*/s/*Martell Harris
Martell Harris, Esquire
Pa. Id. No. 319504
*Attorneys for Tawnya Roman*

U.S. Steel Tower
600 Grant Street, Suite 660
Pittsburgh, PA 15219
412.626.5585 (p)
412.637.0231 (f)
mh@lawkm.com